Filed 6/18/13  P. v. Sorto CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DOUGLAS CASTELLANOS SORTO,<br><br>    Defendant and Appellant. | F063821<br><br>(Super. Ct. No. VCF199947)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Michael A. Canzoneri, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Douglas Castellanos Sorto of first degree burglary (Pen. Code,[1] §§ 459, 460) after he was found inside a neighbor's house. He contends that the trial court erred, first, by allowing the prosecutor to impeach him by stating he had been convicted of a "serious and violent" felony and, second, by instructing the jury on sexual battery as a possible intended target offense for the charged crime of burglary. Sorto also claims there was insufficient evidence of intent to commit either theft or sexual battery to support the burglary conviction.

We affirm the judgment.

### *FACTUAL AND PROCEDURAL HISTORIES*

Around 8:00 p.m. on January 19, 2008, Visalia police officers responded to a report that a man had broken into a house on East Sunnyview Avenue. Maria Murphy and her daughter, Julia Garza, reported that a man had been in their house; he left through a window.

Sorto was arrested and charged with one count of first degree burglary. (*People v. Sorto* (Mar. 15, 2011, F058933) [nonpub. opn.], pp. 1-2.) In the first trial, a jury found Sorto guilty, and the court sentenced him to nine years in prison. (*Id.* at p. 6.) We reversed and remanded because the trial court erroneously admitted evidence that Sorto committed a burglary five years earlier. (*Id.* at p. 7.)

A second jury trial began on August 30, 2011.

***Prosecution's case***

Murphy testified that she lives in a house on East Sunnyview Avenue with her roommate Shelly Havner. It is a two-story house, and Havner's bedroom is upstairs and Murphy's is downstairs. Havner always locks her bedroom door. In January 2008, Murphy's two daughters were both living with her and they shared the downstairs bedroom with her.

---

[1]Subsequent statutory references are to the Penal Code unless otherwise stated.

On January 19, 2008, Murphy and her older daughter, Julia Garza, were at home watching television in the living room. Murphy's younger daughter was away with her father, and Havner had gone to the coast with her boyfriend. Murphy heard a noise. She looked up and saw, through a mirror over the fireplace, that someone was crawling up the stairs behind her. Garza called 911, and Murphy grabbed the man by the back of the shirt and pushed him down the stairs. Murphy recognized the intruder as a person who lived across the street. She asked him what he was doing there, and "he took off running and went out the way he came in." He went into her bedroom where he had entered and left through the window. Earlier, Murphy had left her bedroom window open to air out the house after she cleaned the bathroom with bleach, but there had been a screen on the window. Now Murphy saw that the screen was off the window. Nothing was missing from her bedroom.

Murphy recognized the intruder—later identified as Sorto—because she would see him in front of his house when she was coming home from work. They would wave to each other, but she did not have conversations with him. She recalled that one time when she was in her car, Sorto said that she had almost hit a dog. Another time, Murphy asked Sorto if he had seen her daughter, and he told Murphy she was down the street. Murphy testified that she was not romantically involved with Sorto and she had never invited him over to her house. She had a boyfriend at the time.

Garza testified that, while she was watching a movie with her mother, her mother put her hand on Garza's shoulder and she looked as though she had just seen a ghost. Murphy then got up and went to the stairs, and Garza saw in the mirror that a grown man was on the stairs. Garza grabbed the telephone and called 911. She heard her mother say, "'How dare you come into our home and break in.'" The man tried to fight with Murphy and go through the front door to escape, but Murphy was blocking the door. The man said "if she [Murphy] ever did anything that she was going to regret it." Garza had never

seen this man before. The police later showed her a photographic lineup and she was unable to identify the intruder.

Garza first called 911 when she saw Sorto in the house, and Murphy called 911 after he had left the house. An audiotape of the 911 calls was played for the jury.

*Defense case*

Sorto admitted that he entered the house through the window but claimed he had been invited by Murphy. He testified that he and Murphy had a "side relationship for a while," meaning they had a sexual relationship.[2] The relationship began in the summer of 2007, when Sorto was staying with his brother and sister-in-law, who lived across the street from Murphy. When Murphy would go to work, if Sorto was outside, Murphy would stop in front of his house and talk for a minute. He said they would also talk when she took out the trash or walked her roommate's dog. Sorto then went to Long Beach.

In January 2008, Sorto spent a couple weeks visiting his brother and sister-in-law. He bumped into Murphy, and they agreed to meet the next day, Saturday, January 19, 2008, at around 7:00 or 7:30 in the evening. Murphy told him she was going to be with her older daughter that weekend and to come through the back. Sorto explained, "She didn't want nobody to think wrong of her. Everybody seen her with the guy she's actually dating. So she told me she would leave the window open for me to come into the house through the window." She told him to go upstairs to the upper bedroom. He had not been in the house before.

To get to Murphy's backyard, Sorto hopped the fence. He entered the house and was halfway up the stairs when Murphy started yelling at him. She locked the front door. He testified, "After she started screaming, I told her what was she … doing? There was no need for whatever reason she was mad at me. There was no need for the cops. No

---

[2]On cross-examination, Sorto said he had sex with Murphy "two or three [times] at the most" prior to January 19, 2008, and it "wasn't a long-term relationship." He had never had sex in her home.

need for her to make such an exaggeration. I told her there was no need for that." Sorto saw that Murphy "was getting hysterical," and he "left the same way [he] came in." He denied that they struggled on the stairs or that Murphy pulled him down the stairs.

Sorto then went to a friend's house, not his brother's house across the street. He testified that when he went into Murphy's house, he did not intend to steal anything or do anything Murphy had not invited him to do. On cross-examination, he agreed that he wanted to have sex with Murphy after he entered her home.

Jose Guzman is Sorto's brother and lived across the street from Murphy. He testified that he saw Sorto talking to Murphy several times. They were "[h]ugging, touching, real close to each other."

On cross-examination, Guzman said that Sorto was staying with him on January 19, 2008, and he had seen Sorto earlier that day. When the police asked Guzman about Sorto the night of the incident, however, he told the officers that he did not know where Sorto was and the last time he saw him was Christmas. He told the police that Sorto was not staying with him.

Deynira Castellanos was married to Guzman (they have since divorced) and lived across the street from Murphy. She testified that she saw Sorto and Murphy talking in her yard. They hugged, leaned in against each other, and touched each other. Castellanos saw them talking and "flirting and hugging each other" five or six times. She did not hear any of their conversations.

The prosecution's theory was that Sorto entered Murphy's house with the intent to commit theft and sexual battery. In his closing statement, the prosecutor cited evidence that Sorto had no right to be in the house, he entered by scaling a fence and removing a screen from a window, and when he was confronted, he struggled with Murphy and then left "as fast as possible." The prosecutor argued that Sorto's claim that a sexual relationship developed from a few short conversations with Murphy made no sense.

5.

Sorto's attorney argued that the circumstantial evidence did not show beyond a reasonable doubt that Sorto had the intent to commit sexual battery or theft when he entered Murphy's house. He told the jury that Sorto did not take anything from Murphy's bedroom and he did not attempt to sexually assault Murphy or her daughter. Instead, Sorto's attorney argued, both Sorto's and Murphy's behavior that night made more sense if the jury concluded that Sorto was telling the truth and Murphy was trying to hide her relationship with him from her daughter.

After about an hour of deliberation, the jury found Sorto guilty of first degree burglary. In a bifurcated proceeding on enhancement allegations, Sorto admitted that he had suffered a prior felony conviction that was both a strike (§ 1170.12, subds. (a)-(d)) and a serious felony (§ 667, subd. (a)(1)). The court sentenced Sorto to nine years in state prison, consisting of a mitigated term of two years, doubled because of the prior strike to four years (§ 1170.12, subd. (c)(1)), plus five years for the serious felony conviction (§ 667, subd. (a)(1)).

## *DISCUSSION*

### I.     *Impeachment with reference to prior "serious and violent" felony conviction*

On appeal, Sorto contends that the trial court improperly permitted the prosecutor to impeach him by stating he had previously been convicted of a "serious and violent" crime. We agree that the prosecutor's question about his prior conviction was not correctly phrased, but we conclude Sorto has failed to show prejudice.

In the first trial, the prosecution called a Long Beach Police detective to testify about a prior burglary committed by Sorto. (*People v. Sorto*, *supra*, F058933, p. 5.) The detective testified that in 2003 he arrested Sorto in the backyard of a house in Long Beach. A window of the house was open and the screen had been removed. The detective testified that Sorto told him he had entered the house to steal "'to take care of his crystal meth habit.'" The prosecutor emphasized the detective's testimony in both her opening and closing statements, arguing that the prior burglary was material to prove

6.

intent in the current case. The court instructed the jury that it could consider the prior burglary when deciding whether Sorto had the intent to commit a theft when he entered Murphy's house. (*Ibid*.) On appeal, we reversed the judgment, concluding there was not enough similarity between the prior burglary and the charged offense for the prior conviction to be admitted as evidence that Sorto entered Murphy's house with criminal intent. (*Id*. at p. 9.)

On the other hand, a witness's prior conviction for a crime involving moral turpitude may be used to impeach that witness, subject to the trial court's discretion under Evidence Code section 352. (Evid. Code, § 788; *People v. Castro* (1985) 38 Cal.3d 301, 306.)

In the second trial, at a pretrial hearing, the prosecutor indicated that if Sorto chose to testify, he would like to impeach him with his prior felony conviction. The court ruled that the prosecutor could impeach with prior convictions, but "not specific as to the exact crime." The following discussion occurred:

> "[Prosecutor]: How would the Court want me to—my submission would be, 'Isn't it true you have been convicted of a felony of a crime of moral turpitude?' Something along those lines?
>
> "THE COURT: Correct. I think it's a serious or violent felony.
>
> "[Prosecutor]: It is.
>
> "[Sorto's attorney]: Yes.
>
> "THE COURT: It's my tentative to say, 'Isn't it accurate you have previously been convicted of a violent felony that goes to moral turpitude,' but not the specifics of the crime."

When Sorto testified on his own behalf, his own attorney elicited testimony that he had been convicted of a prior "felony of moral turpitude." Sorto agreed that he "took responsibility for that" by pleading guilty. During cross-examination, the prosecutor asked, "In 2003 you were convicted of a serious and violent felony that consisted of a moral turpitude crime, yes?" Sorto's attorney did not object to the question. Sorto

7.

responded, "From what I know, yes. It wasn't violent. It was just a serious crime." The prosecutor had no further questions.

The prosecutor did not mention Sorto's prior conviction in either his opening or closing statement. Sorto's attorney referred to the prior conviction to explain why Sorto left the house after Garza called the police. In his closing statement, he told the jury:

> "The other thing they make a big deal about is he didn't hang around and wait for the police. Like he said, he has been convicted of a felony. If someone said, 'I'm going to call the police and tell them you broke into my house, and you had been convicted of a felony,' you assume the police aren't going to believe you. What would you do? Would you hang around and wait for all this, and wait to sit where [Sorto] is sitting now or take your chances?"

The jury was instructed that it could consider a witness's prior felony conviction in evaluating that witness's credibility, but a conviction "does not necessarily destroy or impair a witness's credibility." The court told the jury, "It is up to you to decide the weight of [that] fact and whether that fact makes the witness less believable."

Sorto acknowledges that his prior burglary conviction was admissible for impeachment purposes because burglary is a crime of moral turpitude. (*People v. Muldrow* (1988) 202 Cal.App.3d 636, 646.) Sorto also agrees it was appropriate to "sanitize" the prior conviction by not allowing the prosecutor to describe the prior conviction as the specific crime of burglary. (See, e.g., *People v. Massey* (1987) 192 Cal.App.3d 819, 822, 825 [proper to admit prior convictions, sanitized as undesignated felonies, to impeach defendant]; *People v. Foreman* (1985) 174 Cal.App.3d 175, 182 [no error to sanitize prior burglary as "felony involving theft"].)

Consequently, it was proper in this case for the jury to learn that Sorto had a felony conviction for a crime involving moral turpitude. In addition to referring to Sorto's prior conviction as a "felony that consisted of … moral turpitude," however, the prosecutor described the prior conviction as "serious and violent." As Sorto points out, a burglary is not necessarily violent. (See §§ 459, 460 [definitions of burglary and first degree

burglary].) Nothing in the record indicates that the prior conviction involved violence; nor is burglary designated a "violent" felony under section 667.5, subdivision (c).[3] Sorto argues that calling the prior crime "violent" was "severely prejudicial." Under the circumstances of this case, we are not persuaded.

First, crimes involving moral turpitude have been defined by various courts as crimes that show a "readiness to do evil" and display moral depravity. (E.g., *People v. Massey*, *supra*, 192 Cal.App.3d at p. 822 ["To be relevant to credibility, the prior offense must be a crime displaying moral turpitude or depravity, indicating a 'general readiness to do evil'"]; *People v. Castro*, *supra*, 38 Cal.3d at p. 315.) Courts have also recognized that a sanitized description of a prior conviction for a crime involving moral turpitude is admissible to impeach a witness, "notwithstanding the possibility of jury speculation" as to the nature of the crime. (*People v. Massey*, *supra*, at p. 825; see *People v. Hinton* (2006) 37 Cal.4th 839, 877 [recognizing risk of jury speculation as to nature of prior convictions admitted for impeachment purpose].) Given that Sorto could properly be impeached with his prior conviction for a crime involving moral turpitude despite the risk of jury speculation about the nature of that crime, it is not obvious to this court that the error of impeaching Sorto with reference to his prior conviction as "violent" would result in prejudice. It is questionable whether the harm to Sorto's credibility was greater because his prior conviction was described by the prosecutor as violent as well as a crime involving moral turpitude.[4]

---

[3]Only a first degree burglary in which it is charged and proved "that another person, other than an accomplice, was present in the residence during the commission of the burglary" is considered a violent felony. (§ 667.5, subd. (c)(21).)

[4]In his reply brief, Sorto argues for the first time that the use of the adjective "serious" was also prejudicial. We similarly doubt that a jury would be more likely to distrust a witness who had been convicted of a "serious" crime than a witness who had been convicted of a crime "involving 'moral turpitude.'"

More important, as the Attorney General observes, in this case there was no evidence presented that Sorto's prior conviction involved a violent crime. In response to the prosecutor's impeachment question, Sorto corrected the prosecutor, stating that the prior crime "wasn't violent." The prosecutor did not challenge Sorto's response or present any other evidence of the prior conviction. While Sorto's own testimony was evidence that he had been convicted of a felony involving moral turpitude, there was *no* evidence before the jury that Sorto had been convicted of a violent crime.

Finally, the fact that Sorto had a prior felony conviction was not emphasized by the prosecutor. In the first trial, a detective testified about the specifics of the burglary, and the prosecutor stressed the detective's testimony in her opening and closing statements, urging the jury to find that the prior crime and the current charge were part of a common plan or scheme. (*People v. Sorto*, *supra*, F058933, p. 5.) In the retrial, there was no evidence on the specifics of Sorto's prior crime, and his conviction was not mentioned at all in the prosecutor's arguments. The jury was also instructed that prior crimes could be considered in assessing credibility. Under the totality of the circumstances, including Sorto's uncontested testimony that his crime was not violent, we conclude it is not reasonably likely the outcome would have been different had the prosecutor asked only if Sorto had been convicted of a crime involving moral turpitude.

Sorto also claims that his attorney provided ineffective assistance of counsel by failing to object to the characterization of his prior conviction as "serious and violent." Given our conclusion that there was no prejudice, his ineffective-assistance-of-counsel claim also fails. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [to prevail on ineffective-assistance claim, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)

## II.     *Jury instruction on sexual battery*

In this case, the trial court gave the following jury instruction:

10.

"To prove the defendant is guilty of [burglary], the People must prove that: The defendant entered a building, and when he entered a building, he intended to commit theft or sexual battery.… [¶] A burglary was committed if the defendant entered with the intent to commit theft or sexual battery. The defendant does not need to have actually committed theft or sexual battery as long as he entered with the intent to do so."

The court then instructed the jury on the elements of the crimes of theft and sexual battery. Sorto contends that it was error to instruct the jury on sexual battery as a possible target offense for the charged offense of burglary because this theory was not supported by substantial evidence. We disagree.

"[T]he trial court must instruct on the general principles of law applicable to the case," which means the court "must give instructions on every theory of the case supported by substantial evidence .…" (*People v. Young* (2005) 34 Cal.4th 1149, 1200.) Substantial evidence is evidence a reasonable jury could find persuasive. (*Ibid*.) In determining whether an instruction should be given, the court does not weigh the credibility of the evidence. (*Ibid*.) By the same token, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

Burglary is defined as entering a house (or other listed structure or space) "with intent to commit grand or petit larceny or any felony .…" (§ 459.) Sexual battery is defined as "touch[ing] an intimate part of another person while that person is unlawfully restrained … against the will of the person touched," which is done "for the purpose of sexual arousal, sexual gratification, or sexual abuse .…" (§ 243.4.)

"Proof of intent is rarely susceptible of direct proof and may be inferred from the circumstances of the case." (*People v. Moody* (1976) 59 Cal.App.3d 357, 363.) Indeed, "'[b]urglarious intent can reasonably be inferred from an unlawful entry alone.'" (*People v. Martin* (1969) 275 Cal.App.2d 334, 339.) Circumstances such as flight upon discovery may also support an inference of felonious intent. (*Ibid*.)

11.

In *People v. Moody*, *supra*, 59 Cal.App.3d at page 360, a 15-year-old babysitter awoke at 3:00 a.m. and heard a sound. She turned around and saw the defendant standing in the hallway with his arms outstretched. She made a noise, and the defendant ran out the front door. When the police arrived, one officer hid in the bushes and saw the defendant come out of the yard of the house directly behind the house where the babysitter had seen him. When the officer told the defendant to freeze, the defendant ran; the officer chased and caught him. (*Ibid*.)

A jury found the defendant guilty of first degree burglary. (*People v. Moody*, *supra*, 59 Cal.App.3d at p. 360.) The prosecution's theory at trial was that the defendant entered the house with the intent to commit rape or theft. On appeal, the defendant contended there was insufficient evidence to support his conviction for burglary. (*Id*. at p. 362.) The Court of Appeal disagreed, explaining: "Appellant entered the structure, to wit, a dwelling house, at night after all the doors had been locked and when discovered he had his arms outstretched toward the intended victim, a 15-year-old girl who was dressed only in a nightgown. When discovered he ran. Thereupon when confronted by a police officer appellant once again took flight. From the above facts, the jury could have concluded and there was substantial evidence to support a finding that appellant had either entered the house with an intent to commit theft or to commit rape." (*Id*. at p. 363.)

In *People v. Matson* (1974) 13 Cal.3d 35, 41-42, our Supreme Court concluded there was sufficient evidence to support a burglary conviction based on the circumstances that the defendant entered the victim's apartment surreptitiously, hid in her bathroom with the lights out, and denied having done so.

Here, the evidence showed that Sorto entered Murphy's house by hopping a fence, removing a window screen, and climbing through a bedroom window. With Murphy and her daughter watching television in the living room, he proceeded through the house and started up the stairs. Sorto thought there was a bedroom upstairs. According to Murphy, he crawled up the stairs. Garza testified that Sorto fought with Murphy and threatened

her. He then fled the house after Garza called the police. Sorto testified that, when he entered the house, he wanted to have sex with Murphy. Further, Murphy lived in the house with her daughters and a female roommate. No men lived in the house. These circumstances were sufficient to support an inference that Sorto entered the house with the intent to commit sexual battery. It follows that the trial court was correct to instruct the jury on sexual battery as a possible target offense of the charged crime of burglary.

Sorto's reliance on *People v. Duke* (1985) 174 Cal.App.3d 296 is misplaced. In that case, the defendant groped three different women, variously touching—over their clothes—the victims' thigh, chest, stomach, and crotch. (*Id*. at p. 299.) The court observed that, since sexual battery required touching of the bare skin of the victim, no sexual battery occurs when a victim is grabbed or touched through her clothing.[5] (*Id*. at pp. 299-300.) The court then held there was insufficient evidence of attempted sexual battery by the defendant. It reasoned that there was no evidence the defendant *intended* to touch the skin of any of the victims. (*Id*. at p. 301.) *Duke* may be correct as far as it goes, but it has no application to the facts of this case. In that case, the defendant apparently completed the crimes he intended to commit, and those crimes did not involve touching bare skin. Here, the inference of Sorto's burglarious intent is based on the circumstances of sneaking into a house where a woman and her teenage daughter were inside watching television, crawling up the stairs, fleeing when confronted, and Sorto's own testimony that he was there to have sex. He was unable to complete his intended crimes because he was discovered and the police were called.

---

[5]The statutory definition of sexual battery has since been changed. (§ 243.4, subd. (e)(2) [touching "means physical contact with another person, whether accomplished directly, through the clothing of the person committing the offense, or through the clothing of the victim"].)

### III. *Sufficiency of evidence*

Sorto next contends there was insufficient evidence to support a finding of either intent to commit theft or sexual battery. This claim is without merit.

When an appellant raises a claim of insufficiency of the evidence, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. [Citation.] We may reverse for lack of substantial evidence only if '"upon no hypothesis whatever is there sufficient substantial evidence to support"' the conviction or the enhancement. [Citation.]" (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1508.)

Our conclusion that the jury was properly instructed on sexual battery also leads us to conclude there was sufficient evidence to support a jury finding of intent to commit sexual battery. (E.g., *People v. Moody*, *supra*, 59 Cal.App.3d at p. 363 [circumstances of entry at night into house where 15-year-old girl was babysitting, plus flight upon discovery, were substantial evidence supporting finding defendant entered house to commit rape or theft].)

There was also sufficient evidence to support a jury finding of intent to commit theft. Unlawful entry, flight from the scene, and failure to provide a plausible reason for being on the premises are sufficient evidence of intent to commit theft to support a conviction of burglary. (*People v. Martin*, *supra*, 275 Cal.App.2d at p. 339.)

Finally, Sorto argues that the cumulative errors at trial resulted in prejudice. Since we have concluded the reference to Sorto's prior violent crime did not cause prejudice and it was not error to instruct the jury on sexual battery as a target offense of burglary, this claim also fails.

14.

## *DISPOSITION*

The judgment is affirmed.

_____
Wiseman, Acting P.J.

WE CONCUR:


_____
Cornell, J.


_____
Franson, J.

15.